CSX TRANSPORTATION,
INC., Plaintiff,

v.

The STATE BOARD OF EQUALIZATION OF the State of GEORGIA; Bart L. Graham, Commissioner of Revenue of the State of Georgia; Russell W. Hinton, State Auditor of the State of Georgia; and Ray J. Crawford, Director of the Georgia State Properties Commission, Defendants.

Civil Action No. 1:02–CV–2634–CAP.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 29, 2005.

Anne M. Stolee, James W. McBride, Baker Donelson Bearman & Caldwell, Washington, DC, Gregory G. Fletcher, Stephen D. Goodwin, Baker Donelson Bearman Caldwell & Berkowitz, Memphis, TN, Timothy Harold Kratz, Milo S. Cogan, McGuire Woods LLP, Atlanta, GA, for Plaintiff.

Daniel M. Formby, Thurbert E. Baker, Office of State Attorney General, Warren R. Calvert, State of Georgia Law Department, Atlanta, GA, Peter J. Crossett, John D. Cook, Hiscock & Barclay, LLP, Syracuse, NY, for Defendants.

### ORDER

PANNELL, District Judge.

The plaintiff, CSX Transportation, Inc. ("CSXT") filed this suit under Section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. 94–210, 90 Stat. 54 (Feb. 5, 1976), which is now codified at 49 U.S.C. § 11501 (the "4–R Act"). The 4–R Act confers concurrent jurisdiction on federal district courts to enforce its provisions, so long as "the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction." *Id.* § 11501(c). Such jurisdiction lies notwithstanding the Tax Injunction Act of 1937, 28 U.S.C. § 1341, which ordinarily prohibits district courts from enjoining, suspending or restraining the assessment, levy or collection of taxes under state law where the party may have a plain, speedy, and efficient remedy in state court. *Id.; Southern Railway Co. v. State Board of Equalization,* 715 F.2d 522, 526 (11th Cir.1983).

For the 2002 tax year, the Department of Revenue of the State of Georgia (the "Department") determined that the unit value of CSXT's rail transportation property was $8.2 billion and that the fair market value of CSXT's taxable railroad operating property in Georgia was $514,862,671 (the "Proposed Valuation"). The Department presented that value to the State Board of Equalization for the State of Georgia (the "Board") for approval. The Board approved the Proposed Valuation and issued a Notice of Proposed Assessment dated November 25, 2002.

CSXT makes three claims under the 4–R Act based on the Department's Proposed Valuation. First, CSXT claims that the Proposed Valuation is excessive and discriminatory in that the Department assessed CSXT's rail transportation property for ad valorem tax purposes at a higher ratio of assessed value to true market value than the ratio applicable to other commercial and industrial property in Georgia in violation of 49 U.S.C. § 11501(b)(1). Specifically, CSXT claims that the true

market value of its rail transportation property on a unitary basis for the 2002 tax year does not exceed $6 billion, and that the true market value of its taxable rail transportation in Georgia does not exceed $369,253,752. This valuation claim is based primarily on an appraisal done by Mr. Thomas Tegarden, whose credentials are impeccable.

Second, CSXT claims that it has been singled out for discriminatory tax treatment by the defendants for the tax year 2002 in violation of 49 U.S.C. § 11501(b)(4). In particular, CSXT claims the Department's assessment of other centrally-assessed property is not based on the fair market value of those properties. CSXT also claims that it is the only major centrally-assessed taxpayer in Georgia that suffered a significant tax increase for the tax year 2002.

Third, CSXT contends that the defendants discriminated against it in violation of 49 U.S.C. § 11501(b)(4) because the Department's Proposed Valuation for the tax year 2002 improperly included its intangible property, while the intangible property of all other commercial and industrial taxpayers is excluded from taxation. CSXT argues that the Department's valuation methods improperly compound intangible value, and CSXT urges the court to order the Department to use a yield capitalization approach, which CSXT claims will minimize the inclusion of intangible assets in the Department's valuation.

The matter was tried by the court sitting without a jury from May 16, 2005, through May 25, 2005. The court took the case under advisement pending the filing of post-trial briefs. The following order

constitutes the court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

*Factual Background*

I. *The Parties*

A. *CSXT*

CSXT, the taxpayer in this case, is a Class 1 interstate common carrier by rail that operates in more than 71 counties in Georgia. It is subject to the jurisdiction of the Surface Transportation Board ("STB").

CSXT is a wholly-owned subsidiary of CSX Corporation. CSX Corporation's stock is publicly traded. As of January 1, 2002, CSX Corporation also owned several other subsidiaries including: (1) CSX World Terminals; (2) CSX Intermodal, Inc.;[1] (3) CSX Lines; (4) CSX Technology, Inc.; and (5) CSX Hotels, Inc.

As of the fiscal year ending December 28, 2001, CSXT accounted for 75% of CSX Corporation's total operating revenues and 78% of its operating income.[2] CSXT's operating revenues for that year alone amounted to $6.082 billion with an adjusted operating income of $803 million.

By the mid–1990's only three Class 1 railroads existed and competed for freight traffic in the eastern half of the United States: (1) Consolidated Rail Corporation ("Conrail"), (2) Norfolk Southern Corporation ("Norfolk Southern"), and (3) CSXT. In August 1998, the STB approved the joint acquisition of Conrail by Norfolk Southern and CSX Corporation. The acquisition included an outright buyout of Conrail's assets by Norfolk Southern and CSX Corporation for approximately $10.5

---

1. CSX Intermodal ("CSXI") moves trailers or containers on flat cars to trucks. In addition, CSXI operates 33 terminals across the United States. When CSXI moves intermodal traffic over CSXT's system, CSXI pays CSXT a "transfer price" of approximately $350 to $400 million annually for CSXI's use of CSXT's resources and routes.

2. Operating income is operating revenues minus total operating expenses.

billion and the assumption of net debt of $1.9 billion.

In June 1999, CSXT began operating portions of Conrail's system. By January 1, 2002, CSXT was operating approximately 42% of the former Conrail system. At that time, CSXT provided rail freight transportation over a network of approximately 40,000 miles of track and 23,000 route miles.[3] CSXT's network included a route through the southeastern United States, including Georgia, as well as a route from the New York/New Jersey area down the east coast to Florida.

CSXT's rail transportation property consists of a variety of items, including land, rail, track material, stations, and equipment. CSXT also operates rolling stock and equipment that it leases. During the time period in question, CSXT had between 34,000 and 36,000 employees and operated between 230,000 to 240,000 freight cars on its system.

Maintaining a rail transportation system requires heavy investment in capital expenditures.[4] Mr. Lewis, a Vice President of CSXT, testified that for the calendar years 2000 and 2001, CSXT's total capital expenditures were between $800 and $900 million.

The acquisition of Conrail had a noticeable effect on CSXT's revenues. For example, in 1997, CSXT's unlevered free cash flow was $467 million. In 1998, after the STB approved the Conrail merger, CSXT's unlevered free cash flow plummeted to negative $115 million. In 1999, CSXT' s unlevered free cash flow again plunged to negative $309 million. By 2000–2001, some efficiencies were beginning to be realized, and CSXT's unlevered free cash flow rose by 154.9% in two years.[5]

Similarly, the Conrail merger also had an effect on CSXT's operating ratio.[6] CSXT's operating ratio prior to the acquisition of Conrail was 75.4%. After acquiring Conrail, CSXT's operating ratio rose to a high of 89.9% and then began to decline again (to a more profitable ratio) in 2001.

Although the acquisition of Conrail had a negative effect on CSXT's financial success in the short-run, the evidence at trial showed that it was likely that some efficiencies would be achieved in the future due to the merger. In fact, even CSXT's own expert, Mr. Tegarden, testified that some costs may be eliminated, which would increase future net operating income.

The evidence at trial also showed that railroads face considerable competition from other modes of transportation, such as trucks. Unlike trucks, however, railroads have to pay for and maintain their own infrastructure. Beginning in 1980, this competition steadily forced rates down. Taking trucks off the highways was the stated goal of the Conrail merger. To that end, the Conrail merger created a huge growth opportunity for CSXT. For instance, in 2001, CSXT was able to move 350,000 truckloads of merchandise off the roads and onto their rails.

### B. *The Defendants*

The defendants are the Board and its individual members, including Bart L. Graham, the State Commissioner of Revenue.

---

**3.** The acquisition of Conrail added 4,400 miles of track to CSXT's rail system in the Northeast United States and Canada.

**4.** The term "capital expenditure" refers to purchases of depreciable assets with long lives.

**5.** In 2001 and 2002, CSXT Surface Transportation had a positive cash flow of around $150 million. Mr. Lewis testified that the positive cash flow was primarily due to real estate sales of $325 million.

**6.** The term operating ratio refers to the ratio of operating expenses to revenue.

The appraised and assessed values of most property in Georgia are determined by county boards of assessors. The parties refer to this property as "locally-assessed" property. Pursuant to O.C.G.A. § 48–5–6, most locally-assessed property subject to taxation in Georgia is to be appraised for assessment purposes at its fair market value. After any such nonexempt locally-assessed property in Georgia is appraised at its fair market value, an assessment ratio of 40% is applied to the appraised value to derive the assessed value. It is this assessed value against which property tax is levied and collected.

Companies classified in Georgia as "public utilities" are commonly referred to as "centrally-assessed" taxpayers. Centrally-assessed taxpayers include railroads, investor-owned electric utilities, investor-owned telephone companies, pipeline companies, and gas distribution companies. The State Revenue Commissioner issues proposed assessments of the operating and non-operating property of public utilities such as CSXT.

The Property Tax Division of the Department annually prepares a proposed assessment of CSXT's railroad transportation operating property for every Georgia county in which CSXT's taxable property is located.

## II. *The Department's Proposed Valuation of CSXT*

In Georgia, the procedure for assessing rail transportation property is set forth in O.C.G.A. § 48–2–18. Under that statute, the Board approves an initial, proposed assessment of the taxpayer's property, and certifies that assessment to the counties in which the taxpayer owns taxable property. *Id.* § 48–2–18(c). *See also Telecom USA, Inc. v. Collins,* 260 Ga. 362, 364–65, 393 S.E.2d 235, 238 (1990) (discussing revised Georgia tax assessment procedures); *Colonial Pipeline Co. v. Collins,* 921 F.2d 1237

(11th Cir.1991) (same). Each county must then issue its final assessment to the taxpayer within 30 days; in doing so, "a county may, but is not required to, use the[ ] figures [provided by the Board] as the county's own tax assessment." *Colonial Pipeline,* 921 F.2d at 1240–41.

The Department used the unit rule method to value CSXT's railroad transportation operating property for 2002 ad valorem tax purposes. The unit rule method values the entire operating system of CSXT as a going concern and integrated whole irregardless of where it is located and without functional or geographic division of the whole into its component parts. A unit value determined pursuant to the unit rule method is meant to capture all of the operating assets of the company whether owned or used. The parties agree that the unit rule method is appropriate under Georgia law.

Gregg Dickerson is the Program Manager in the Public Utilities Section of the Local Government Services Division of the Department. Mr. Dickerson first joined the Department in 1983 and spent ten years doing valuations pursuant to the unit rule method for centrally-assessed public utilities, including railroads. In 1993, he left the Department and went to work for Norfolk Southern railroad as a property tax manager, where his duties included reviewing and negotiating unit values with various states.

In the fall of 2001, Mr. Dickerson was approached by the then-director of the Department, Mr. Larry Griggers, who asked him to return to the Department. Mr. Griggers stated that he was concerned that the public utility digest for Georgia had decreased from 10% to 5% of the total state property tax digest since Mr. Dickerson's departure. Mr. Dickerson agreed to return, but stated that he would not come back for the purpose of "raising the num-

bers." He would only come back if Mr. Griggers' purpose was to "get[ ] the numbers right." Mr. Griggers agreed and Mr. Dickerson returned to work for the Department in September 2001. Mr. Dickerson was the individual responsible for preparing the valuation worksheets that served as the basis for the Department's Proposed Valuation of CSXT for the tax year 2002.

Applying the unit rule method, Mr. Dickerson first prepared a Railroad Valuation Worksheet. The Railroad Valuation Worksheet calculated CSXT's unit value using three valuation methods: (1) a stock and debt approach, (2) a discounted cash flow ("DCF") approach, and (3) a market multiple approach. These different approaches yielded the following values:

| | |
|---|---|
| Stock and Debt | $12.022 billion |
| DCF | $ 8.126 billion |
| Market Multiples [7] | $12.346 billion |
| | $10.769 billion |
| | $ 8.474 billion |

After coming up with this range of values for CSXT, Mr. Dickerson selected $8.2 billion as the lower limit of what the going concern unit value of CSXT could reasonably be. He then used $8.2 billion as the foundation for the Department's Proposed Valuation.

After determining the unit value for CSXT, Mr. Dickerson then estimated a working capital adjustment of $400 million and deducted that from his unit value estimate of $8.2 billion to eliminate the effect of certain intangible assets. Next, Mr. Dickerson allocated the adjusted unit value estimate of $7.8 billion to the state of Georgia by using the percentage of Georgia road miles to system road miles. For the tax year 2002, the percentage so applied equaled 7.194059%, resulting in an allocated value of $561,136,602 for the state of Georgia.

To arrive at CSXT's proposed taxable fair market value in Georgia, Mr. Dickerson then deducted amounts for motor vehicles, exempt pollution control equipment, and exempt railroad lines. As a result, Mr. Dickerson determined that CSXT's taxable fair market value in Georgia for the tax year 2002 was $514,862,671 and presented this number to the Board.

Following the Board's approval, the Department issued a Notice of Proposed Assessment dated November 25, 2002 (the "Proposed Assessment"), to CSXT and to the counties in which CSXT had taxable property. The Proposed Assessment included three components: (1) the portion of the Department's proposed taxable fair market value of CSXT's operating property in Georgia attributable to each county, (2) the level of assessment that the Board determined each county should use, and (3) a proposed assessment for each Georgia county in which CSXT had taxable property, which was derived by multiplying the county's distributed value by 40% or the prevailing level of assessment in that county.

After this litigation commenced, in November 2003, Mr. Dickerson prepared a complete appraisal of CSXT using essentially the same three valuation methods that he employed with the Proposed Valuation. The purpose of this appraisal was to provide the court with Mr. Dickerson's point estimate of CSXT's unit value, rather than a figure at the lower end of his range of fair market values.

Following the close of fact discovery in this case, Mr. Dickerson prepared a revised full appraisal of CSXT in support of the Proposed Valuation. The only difference between Mr. Dickerson's November 2003 appraisal and the revised appraisal involved a change in the calculation of the

---

7. The market multiple approach yielded three different values because the Department cal- culated three different "multiples."

cost of equity used in deriving the weighted cost of capital. The range of values Mr. Dickerson arrived at in his second appraisal were:

| | |
|---|---|
| Stock and Debt | $12.128 billion |
| DCF | $10.960 billion |
| Market Multiples | $12.434 billion |
| | $10.871 billion |
| | $ 8.986 billion |

Based on this range of values, Mr. Dickerson opined that the fair market system value of CSXT as of January 1, 2002, prior to adjustments for leases was $11 billion. Mr. Dickerson then added $807 million to this value to account for the value of CSXT's operating leases. He ultimately opined that the fair market unit value of CSXT was $11.807 billion.

## III. An Overview of the Parties' Valuation Approaches

As noted above, in Georgia, as in most states, a railroad's operating property is valued for property tax purposes as a unit. Under the unit concept of value, the fair market value of the railroad is measured by appraising the whole property as a going concern. To determine the unit value of a company, the appraiser must first choose from and apply a variety of valuation methods.

There are three general approaches to valuing a company or property: (1) the sales comparison approach, (2) the income approach, and (3) the cost approach. The standard sales comparison approach determines the value of a property or company by examining and comparing actual sales of comparable properties or companies. Conversely, the cost approach determines the value of a property by totaling the original costs of the various components of the property, and then making adjustments to account for depreciation or obsolescence. The theory behind the income approach is that anyone who buys a company buys it only for the income the company will generate.

Mr. Dickerson's responsibilities in preparing proposed assessments for centrally-assessed property for the tax year 2002 included reviewing the valuation methods that had been used by the Department in the past. As a result of his analysis, Mr. Dickerson made certain changes to the valuation methods used for all centrally-assessed taxpayers subject to the unit rule method. Those changes, which were applied on an across-the-board basis, included replacing the existing capitalized earnings approach with a DCF model. He also replaced what had been labeled as a direct capitalization approach with a market multiple approach.

For CSXT, Mr. Dickerson used three different valuation methods: (1) a stock and debt approach, (2) a DCF approach, and (3) a market multiple approach. In rough terms, the stock and debt method is a surrogate for the sales comparison approach. It assumes that the value of a company equals all of the outstanding debt owned by that company plus the company's equity. Similarly, the market multiple approach is also a substitute for the sales comparison approach. Under a market multiple approach, the appraiser derives market multiples from the stock prices of companies that are engaged in similar lines of business and compares those multiples with the subject company to determine the value of that company.

Unlike the stock and debt and market multiple approaches, the DCF approach is a version of the income approach. Under the DCF approach, the appraiser makes assumptions to project cash flows for the company for a designated number of years after the assessment date, and then discounts those expected cash flows to their present value. The appraiser then calculates a terminal or reversion value representing the value of the company at the end of the projection period. The total of the discounted cash flows during the pro-

jection period and the terminal value gives the appraiser his unit value for the company.

CSXT's valuation expert, Mr. Tegarden, also used three valuation methods to value CSXT: (1) a stock and debt approach, (2) a cost approach, and (3) a yield capitalization approach. The yield capitalization approach is another variation of the income approach. It can perhaps be described as a cousin of the Department's DCF approach. For example, the Department's DCF model is expressed as:

$$V = \frac{(CF1)}{(1+k)} + \dots \frac{(CFn)}{(1+k)} + \frac{T}{(1+k)}$$

Cfn = net cash flow for the year n, k = discount rate, T = terminal value, and n = year. Mr. Tegarden's yield capitalization approach is expressed by the formula:

$$V = \frac{I}{r}$$

I = income and r = discount rate.

Mr. Tegarden gave no weight to his stock and debt value, very little weight to his calculations under the cost approach, and primary weight to his yield capitalization value. Using this weighted scale, Mr. Tegarden picked approximately $6 billion as the unit value of CSXT.

### Legal Analysis

#### I. The 4–R Act

The 4–R Act prohibits a state from "[a]ssess[ing] rail transportation property at a value that has a higher ratio to [its] true market value ... than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to [its] true market value...." 49 U.S.C. § 11501(b)(1). The 4–R Act also prohibits states from levying or collecting taxes based on such an assessment, or otherwise discriminating against rail carriers in taxation. *Id.* § 11501(b)(2)-(4). "Assessment" is defined in the 4–R Act as "valuation for a property tax levied by a taxing district." *Id.* § 11501(a)(1).

#### II. Burden of Proof

■ The burden of proof in a case brought under the 4–R Act is determined by state law. 49 U.S.C. § 11501(c). The 4–R Act requires a district court to use the burden of proof generally applicable to civil proceedings. *See Burlington Northern Railroad Co. v. Bair*, 766 F.2d 1222, 1226 (8th Cir.1985); *Atchison, Topeka, and Santa Fe Railway v. Lennen*, 732 F.2d 1495, 1500 (10th Cir.1984). In Georgia, a preponderance of the evidence is "the essential quantum of evidence ... necessary to satisfy the minds of the fact finders in civil cases." *Ocean Accident & Guarantee Corp. v. Bates*, 104 Ga.App. 621, 622, 122 S.E.2d 305, 307 (1961). Thus, CSXT's burden is the preponderance of the evidence standard.[8]

---

**8.** The defendants contend that the court must accept their tax assessment as prima facie correct, and that the burden is on CSXT to show that their assessment is in error. The defendants' argument is based on their belief that the burden of proof applicable in this case is the same burden of proof used when a taxpayer litigates the assessment they received in Georgia. This is not, however, a case where CSXT is simply appealing the Department's assessment. This is a case brought under the 4–R Act and the court must determine the true market value of CSXT. CSXT, in turn, has the burden of proving by a preponderance of the evidence that the true market value of its property is $6 billion. To do this, CSXT presented two types of evidence. First, it criticized the Department's calculations. Second, it presented a valuation of its property by Mr. Tegarden. In a more typical case, the court would look at both Mr. Tegarden's appraisal and the Department's appraisal to determine the true market value of CSXT. If the court found by a preponderance of the evidence that CSXT's true market value was $6 billion, as proposed by CSXT, then the court would compare the Department's Proposed Valuation to CSXT's true market value to determine if discrimination occurred. However, as explained later

III. *Whether the Department Assessed CSXT's Operating Property in Georgia for the Tax Year 2002 in Excess of its True Market Value, Resulting in a Ratio of Assessed Value to True Market Value for CSXT's Property which Exceeds by More than 5% the Ratio of Assessed Value to True Market Value of Other Commercial and Industrial Property in Georgia*

A. *May CSXT Challenge the Department's Chosen Valuation Methods?*

■ In this case, the parties disagree over the proper way to calculate the value of CSXT under each valuation method. Significantly, the parties also disagree over which valuation method the Department should use to value CSXT.

One of the problems with subjecting complex issues like valuation to judicial determination is that the court generally must choose among the competing claims of experts. Unless the court performs its own appraisal, the court must rely either on CSXT's experts or the Department's experts. The court, of course, may adjust an expert's appraisal up or down based on other experts' critiques of the appraisal, but the starting point for judicial determination is always one appraisal or another, and each appraisal is based on a particular methodology that, to a large extent, predetermines the result. Thus, implicit in the court's holding is a decision as to the proper valuation method.

The evidence shows that all five approaches used by CSXT and the Department, the yield capitalization, DCF, stock and debt, market multiple, and cost approaches, are widely used to value property. The question, then, is whether the Department is free to choose among accepted valuation methods or whether the

4–R Act compels the use of one particular method.

The United States Supreme Court in *Burlington Northern Railroad Co. v. Oklahoma Tax Commission*, 481 U.S. 454, 463 n. 5, 107 S.Ct. 1855, 1861 n. 5, 95 L.Ed.2d 404 (1987), expressly left open the question of "whether a railroad may, in an action under [the 4–R Act], challenge the appropriateness of the accounting methods by which the state has determined the railroad's value, or is instead restricted to challenging the factual determinations to which the state's preferred accounting methods were applied." *Id.*

Since the *Burlington Northern* decision, several courts have answered this question. Perhaps the most followed decision is the Fourth Circuit's decision in *Chesapeake Western Railway v. Forst*, 938 F.2d 528, 533 (4th Cir.1991), *cert. denied*, 503 U.S. 966, 112 S.Ct. 1577, 118 L.Ed.2d 220 (1992). *See also Burlington Northern Railroad Co. v. Bair*, 815 F.Supp. 1223, 1228–29 (S.D.Iowa 1993) (following *Chesapeake* and holding that a railroad may not challenge the state's chosen methodology); *cf. Union Pacific Railroad Co. v. State Tax Commission of Utah*, 716 F.Supp. 543, 556–57 (D.Utah 1988) (holding that as long as the state's method has a rational basis and was not chosen for a discriminatory purpose, the court will not disturb the state's choice). In *Chesapeake*, the railroad brought an action challenging Virginia's "over the fence" method of valuing railroad property and arguing for use of the unit method. *Chesapeake*, 938 F.2d at 530. Relying primarily on the 4–R Act's legislative history, the Fourth Circuit concluded that the 4–R Act "does not provide a basis for railroads to challenge a state's preferred methodology for ascertaining

---

in this order, the court cannot consider Mr. Tegarden's valuation because it was prepared using different valuation methods than the

Department. The court, therefore, is limited to looking solely at CSXT's criticisms of the Department's valuation.

the true market value of railroad property." *Id.* at 533; *see also Richmond, Fredericksburg & Potomac Co. v. Forst,* 4 F.3d 244, 250 (4th Cir.1993) ("[A] railroad may present independent evidence of the fair market value of its property, provided, of course, that it limits its evidence to factors that may properly be taken into account under the state's chosen methodology.").

As support for its argument that the court should allow it to challenge the Department's valuation methods, CSXT cites to decisions from the Second and Ninth Circuit. Neither of these circuits, however, allowed a railroad to freely challenge the state's methodology. For instance, in *Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 482 (2d Cir.1995), the Second Circuit held that the state must apply the "same valuation standard and methods to the railroad property as are used on the commercial and industrial properties to which [the railroad] is compared." The implicit holding in *Hyde Park,* therefore, is that a railroad cannot challenge the state's valuation methods as long as the state uses the same methods for other commercial taxpayers. Here, the evidence at trial showed that the Department used essentially the same valuation methods for CSXT that it used for other centrally-assessed taxpayers.

Similarly, while the Ninth Circuit allowed a railroad to challenge the state's chosen methodology, it also held that the state's chosen methodology is presumed correct and can be defeated only by clear, cogent, and convincing evidence. *Burlington Northern Railroad v. Department of Revenue of the State of Washington,* 23 F.3d 239, 241 (9th Cir.1994).

Although the Eleventh Circuit has yet to address this question, the court finds that the legislative history, which is admittedly rather thin, supports the Fourth Circuit's determination that the 4–R Act does not confer jurisdiction upon this court to order the Department to use a specific accounting method to determine the value of CSXT. The committee report on Senate Bill 927, one of several precursors to the 4–R Act, states that:

> [The bill] does not suggest or require a State to change its assessment standards, assessment practices, or the assessments themselves. It merely provides a single standard against which all affected assessments must be measured in order to determine their relationship to each other. It is not a standard for determining value; it is a standard to which values that have already been determined must be compared.

S.Rep. No. 1483, 90th Cong., 2d Sess.App. B (1968).

Similarly, in hearings on House Bill 16245, another forerunner of the 4–R Act, Mr. Lanier, a railroad representative, testified that, "[t]he standards and methods of valuation that any state wishes to use would be totally unaffected by this legislation." *Chesapeake,* 938 F.2d at 531 (*citing* Hearing Before the Subcommittee on Interstate and Foreign Commerce on H.R. 16245, 91st Cong., 1st Sess. 138 (1970)). Thus, the legislative history suggests that the statute was not meant to require a state to use a particular accounting method, at least as long as the state's chosen methods are rational and were not chosen for a discriminatory purpose.

After eight days of trial, it is apparent to the court that valuation is an art, not a science. Valuing a business requires an appraiser to make "judgment calls," even under CSXT's yield capitalization method. Absent a willing buyer and a willing seller, the determination of true market value for purposes of ad valorem taxation is always an estimate, always an expression of judgment, and always a result built on "judgment calls." The appraisals in this case

are good examples of this. Mr. Tegarden and Mr. Dickerson each used at least three different valuation methods to arrive at the market value of CSXT. Both Mr. Tegarden and Mr. Dickerson arrived at different conclusions as to the value of CSXT under each method that they utilized. For example, CSXT's own expert, Mr. Tegarden, arrived at the following three values for CSXT for the tax year 2002:

| | |
|---|---|
| Cost Approach | $6.150 billion |
| Income Approach | $5.983 billion |
| Stock and Debt Approach | $9.637 billion |

The $3 billion difference in Mr. Tegarden' s values makes clear that the determination of the true market value of CSXT in this case is, at best, an educated guess. The fact that the determination of CSXT's true market value is an educated guess weighs against the court requiring the Department to use a particular valuation method.

In addition to the fact that all appraisals are at best educated guesses, the court is unwilling to dictate a particular valuation method to the Department for other reasons. From the testimony of the Department's witnesses, the court concludes that the Department sincerely seeks to arrive at what it considers to be CSXT's true market value, and that, to that end, it constantly reevaluates its methods and changes them when the Department becomes convinced that they are erroneous. If this court were to conclude that the 4–R Act required the Department to adopt the yield capitalization method of valuation, it would prevent the Department from critically examining its appraisal methods and would discourage it from adopting new and better methods as they become accepted by the appraisal profession.

For all of these reasons, the court concludes that the 4–R Act does not generally allow a railroad to challenge the state's chosen methodology. As long as the Department's chosen valuation methods are rational and were not chosen for the purpose of discriminating against CSXT, the court will not second guess the Department's choice of methods.

Even if the court were forced to choose between competing valuation methods, the court finds that the Department's chosen methods have much to commend them. Not only does the Department consistently use essentially the same approach for all centrally-assessed property, but its valuation methods are based on historical and market data readily available to investors and to the defendants. All three of the Department's valuation methods are widely accepted and used by valuation experts. The fact that these methods are widely used and accepted is evidenced not only by the testimony of the majority of experts, but also by the fact that they have been approved by other courts. *See, e.g., Bair,* 815 F.Supp. at 1228–29 (approving of the use of the stock and debt approach to valuing the BN railroad); *Burlington Northern Railroad Co. v. Department of Revenue of the State of Washington,* No. C90–5417, 1992 WL 201947, at * 4–5 (W.D.Wash. Aug.13, 1992), *aff'd* 23 F.3d 239 (9th Cir.1994) (giving deference to the state's use of the stock and debt, DCF, and cost approaches).

(1) *Whether the Department's Chosen Valuation Methods Are Irrational*

 The court finds that the Department's chosen valuation methods are rational. As noted above, the stock and debt approach, market multiple approach, and DCF approach have much to commend them. They are widely accepted and generally based on historic and market data readily available to the public and investors.

CSXT' s primary criticism of the Department's valuation methods is that they compound intangible values at a higher rate than CSXT's yield capitalization method does. For example, CSXT introduced

testimony showing that stock prices include value attributable to intangible property. Because all three of the Department's valuation methods utilize stock prices derived from CSX Corporation, CSXT's parent company, CSXT argues that the Department's approaches are flawed.

The court agrees that stock prices include intangible value, whether it is "intangible influences" or "intangible property." By extension, therefore, any approach that utilizes stock prices includes some intangible value. Nevertheless, the fact that the Department's approaches include intangible value does not make their use irrational. Both parties' experts agree that the fair market value of a business is meant to value what a willing buyer would pay for that business. Stock prices, thus, are particularly relevant for appraisal purposes because absent a recent sale of the business, the company's stock price is the only real example of what a willing buyer would pay for a share of that business.

The court also points out that CSXT's own valuation methods are not exempt from the same criticism. It is undisputed that CSXT's yield capitalization method relies to some extent on stock prices and includes at least some value attributable to intangible property.

(2) *Whether the Department's Chosen Valuation Methods Were Adopted for a Discriminatory Purpose*

The court also finds that the evidence at trial does not support the conclusion that the Department selected the DCF approach, the stock and debt approach, or the market multiple approach for the purpose of discriminating against CSXT. The evidence at trial showed that the Department utilizes essentially these same methods when valuing non-railroad centrally-assessed property.

Accordingly, the court concludes that CSXT cannot challenge the Department's chosen valuation methods in this case. This ruling, of course, does not prevent CSXT from challenging the manner in which the Department calculated the value of CSXT using its stock and debt, DCF, and market multiple approaches.

B. *Can the Court Consider Mr. Tegarden's Appraisal of CSXT?*

The court is required to weigh the evidence and make its own factual findings regarding the true market value of CSXT. The question then arises as to whether the court can consider evidence of the true market value of CSXT's operating property determined by a valuation method not employed by the Department. The court finds that it cannot do so in this case because the valuation methods chosen by the Department are rational and were not adopted for a discriminatory purpose.

The court must make its factual findings as to the value of CSXT using the methods utilized by the Department. Otherwise, the court will be, in effect, ordering the Department to use a different valuation method.

It is undisputed that the Department used a DCF approach, a stock and debt approach, and a market multiple approach to value CSXT. CSXT's expert, Mr. Tegarden, appraised CSXT using a yield capitalization approach, a stock and debt approach, and a cost approach. Mr. Tegarden testified that he placed no weight on his calculations under the stock and debt approach and little emphasis on his calculations under the cost approach. Therefore, the court concludes that Mr. Tegarden's appraisal is based primarily on the yield capitalization approach with some small emphasis on the cost approach.[9]

9. CSXT admits that the cost approach is not particularly reliable for use in valuing rail-

The court concludes that both the cost approach and the yield capitalization approach are different valuation methods than the Department's valuation methods. Although the yield capitalization approach is undoubtedly a cousin of the Department's DCF approach, the fact that it is truly a different valuation method is most aptly illustrated by the fact that CSXT spent much of its time at trial arguing that the court should order the Department to adopt the yield capitalization approach because the other methods used by the Department to value CSXT were flawed.

Because the yield capitalization and cost approaches are different valuation methods than the methods used by the Department, the court cannot consider Mr. Tegarden's valuation of CSXT under these approaches. Since CSXT has introduced into evidence no other appraisal of its property using the valuation methods employed by the Department, the court must necessarily limit its analysis to the criticisms presented by CSXT as to the manner in which the Department calculated the value of CSXT under its DCF, stock and debt, and market multiple approaches.

## C. *The Department's Appraisals*

█ Before the court reaches CSXT's criticisms of the Department's calculations, the court must first address the two appraisals created by the Department after the commencement of this litigation. As noted earlier, after this litigation commenced, the Department prepared two appraisals of CSXT. The purpose of these appraisals was to provide the court with Mr. Dickerson's point estimate of CSXT's unit value, rather than a figure at the lower end of his range of fair market values. The only difference between the two appraisals was a change in the calcula-

tion of the cost of equity used in deriving the weighted cost of capital.

The fact that the Department created two appraisals significantly complicates this case. The Department urges the court to disregard its original Proposed Valuation and hold that the actual fair market unit value of CSXT is $11.807 billion, which is the value derived from Mr. Dickerson's revised appraisal. CSXT, however, focused the majority of its time at trial and in its post-trial briefs challenging the Department's Proposed Valuation.

The court has considered the Department's revised appraisal. As noted earlier, in its revised appraisal, the Department changed the way it calculated the cost of equity used in deriving the weighted cost of capital for CSXT. It appears to the court that the Department created this new method of calculating the cost of equity in late 2003 or early 2004 and, thus, did not apply this formula to any other taxpayer in 2002. The court questions the relevancy of the revised appraisal for use in this lawsuit. The methods used were not applied to other taxpayers for the year 2002, and the revised appraisal was not used by the Department in assessing the values at issue here. The controversy before the court is the methods and the amounts used, not what could have been used. The court's analysis and approval (or disapproval) of the revised appraisal essentially amounts to an "advisory" opinion. Further, applying this new method of calculating the cost of equity to CSXT when it was not used for any other taxpayer would be inherently discriminatory. Accordingly, the court will focus the remainder of this order on the Department's Proposed Valuation.

road assets because of the substantial obsolescence affecting railroad property. Pl.'s Post–

Trial Br. at 22 [Doc. No. 113].

### D. *CSXT's Criticisms of the Department's Calculations*

■ As noted above, the Department utilized three methods for determining the fair market value of CSXT: (1) the stock and debt approach, (2) the DCF approach, and (3) the market multiple approach. Each of these approaches yielded a different unit value for CSXT. From this range of values, Mr. Dickerson then chose a number, $8.2 billion, that was closest to the lowest value in that range. The $8.2 billion unit value became the foundation for the Department's Proposed Valuation.

CSXT challenges the calculations made by Mr. Dickerson under his Proposed Valuation on four grounds. First, CSXT claims that the Department made errors in its DCF analysis. Second, CSXT claims that the Department calculated excessive stock and debt figures. Third, CSXT claims that the Department utilized excessive market multiple figures. Finally, CSXT claims that the Department improperly double-counted the value of CSXT's leased equipment.

### (1) *CSXT's Criticisms of the Department's DCF Analysis*

To arrive at the DCF value of CSXT, the Department first calculated CSXT's anticipated future operating free cash flows for a ten-year period from 2002 to 2011 based on projections regarding the growth rate of CSXT's revenues, expenses, and capital expenditures. The Department then calculated a terminal value for CSXT (i.e., what a purchaser would expect to pay for the company at the end of the period). Next, the Department discounted this cash flow to January 1, 2002, using as the discount rate a 9.90% after-tax average weighted cost of capital. This calculation yielded a figure of $7,518,317,142, to which the Department added an amount for leased equipment of $607,976,209 to come

up with a DCF value of CSXT of $8,126,293,350.

In particular, the Department's DCF model projected an increase in CSXT's cash flow of 69% from 2001 to 2002. The Department's model also projected a declining growth rate in cash flows from 5.32% in 2003 to 3.58% in 2011 and then assumed a constant terminal growth rate of 6.3% from 2011 into perpetuity. In addition, the Department assumed a 2% growth in revenues per year and projected that CSXT could achieve an 80% operating ratio by 2011.

According to CSXT, several of the assumptions in the Department's DCF model are erroneous because they allegedly have no basis in the historic record of CSXT's performance. In particular, CSXT claims that the Department erroneously projects: (1) a 69% increase in cash flow from 2001 to 2002, (2) a 6.3% terminal growth rate, and (3) an operating ratio of 80% by 2011. CSXT argues that these allegedly erroneous financial projections cause the Department's DCF model to overstate the value of CSXT.

### (a) *The Department's Selection of 69% as the First Year's Cash Flow*

As noted above, the first year of the Department's DCF model assumes that CSXT's cash flow will increase by 69% over CSXT's actual cash flow for 2001. CSXT argues that this increase is bizarre and unsupported by the record. CSXT, however, introduced no evidence at trial as to what increase, if any, the Department should have projected or how that change would have affected the Department's value. In fact, instead of presenting testimony as to what the percentage increase or decrease the Department should have used and how changing that number affects the Department's DCF value for CSXT, CSXT argued that the court should correct the

Department's projected terminal growth rate.

Regardless, the court finds that a 69% increase in projected cash flow from 2001 to 2002 is not bizarre. The evidence at trial showed that CSXT' s cash flow from 1991–2001 increased annually from 5.6% to 154.9% and sometimes declined. In fact, from 2000 to 2001, CSXT's unlevered free cash flow increased by more than 100%. Furthermore, as noted by CSXT' s expert at trial,[10] it is likely that some efficiencies may be achieved in the future due to the integration of CSXT and Conrail. These efficiencies will likely increase cash flow and reduce costs.

**(b)** *The Department's Selection of 6.3% as the Terminal Growth Rate*

CSXT next argues that the Department's decision to choose 6.3% as the terminal growth rate is excessively optimistic. CSXT points out that 6.3% is much higher than the growth rate that the Department projected for the years 2003–2011.

CSXT also argues that the logical incongruence of the Department's terminal growth rate is indicated by the fact that the Department estimated that CSXT' s revenue would grow at only 2%. CSXT points out that if revenue grows at only 2%, while free cash flow (roughly revenue minus expenses) grows at 6.3% then at some point in time expenses would have to decline and become negative to sustain the 6.3% growth in free cash flow.

The court finds that the Department's decision to adopt a 6.3% terminal growth rate is not erroneous. First, to the extent that CSXT's experts opined that 6.3% was

an unrealistic terminal growth rate, the court finds that their testimony was not credible. Second, the court notes that none of CSXT's experts testified as to what a proper terminal growth rate should be. At most, these experts suggested that the Department should have adopted 3.5% or 4.5% as the terminal growth rate. These "suggested" rates also suffer from some of the same infirmities that the rate selected by the Department does. For example, if revenues grow at 2%,[11] but free cash flow grows at any number higher than 2% (e.g., 3.5% or 4.5%) then eventually costs will have to decrease to a negative number.

**(c)** *The Department's Projected Operating Ratio*

CSXT also criticizes the operating ratio forecasted in the Department's Proposed Valuation. CSXT points out that it did not achieve its planned operating income or ratio from June 1999—December 2002. CSXT also presented evidence from Mr. Lewis, CSXT's Vice President of Finance, that the business risks facing the railroad industry make it "difficult to imagine ... hav[ing] a lower operating ratio."

While it is true that CSXT did not achieve its planned operating ratios from 1999–2002, this fact alone does not indicate that the target operating ratios predicted by the Department were erroneous. Among other things, the Department estimated that CSXT would achieve an operating ratio of 80% by the year 2011. Eighty percent is consistent with CSXT' s strategic plan, its presentations to bond rating agencies, and the average historic operat-

---

**10.** This statement was made by Mr. Tegarden in the context of explaining how he came up with $700 million as his estimate of CSXT's future net operating income.

**11.** Because the growth rate for revenue slowed to .4% per year from 1996 to 2001,

CSXT also argues that the Department's projected growth rate of 2% per year for revenue is unduly optimistic. The court disagrees. CSXT admits that a 2% annual growth in revenue is not inconsistent with national trends for railroads between 1991 and 2001.

**1346**

ing ratios achieved by railroads, including CSXT, from 1995–2001. In fact, in 1998, prior to CSXT's acquisition of Conrail, CSXT achieved a 78.6% operating ratio. By 2001, CSXT's operating ratios had begun to decrease from a high of 89.9% in 2000. CSXT's 2001 Annual Report noted this change in trend stating, "With revenues expected to go up this year, the railroad's operating ratio, i.e., total costs as a percentage of total revenues, should improve considerably." Thus, it was reasonable for the Department to project that CSXT would achieve an operating ratio of 80% by the year 2011.

### (2) *CSXT's Criticisms of the Department's Stock and Debt Analysis*

The Department determined the stock and debt value of CSXT by taking normalized year-end price data from Standard & Poor's Stock Guide and information from CSX Corporation's 2001 Annual Report. The Department concluded that the total market value of CSX Corporation's stock, its long-term debt, and the excess of current liabilities over current assets as of January 1, 2002, was $15,219,745,138. The Department next performed several calculations to determine what portion of this total was properly attributable to CSXT. The ratios the Department calculated were: 74. 91%, 81. 89%, 77. 93%, and 75. 47%. The Department selected 75% as a conservative number within that range. The Department then multiplied $15,219,745,138 by 75% to come up with the portion of CSX Corporation's debt and equity which was allocable to CSXT. After adding $607 million for leased equipment, the Department arrived at $12,022,785,209 as the stock and debt value of CSXT.

In CSXT' s post-trial brief, CSXT points out a host of problems with the stock and debt approach generally, as opposed to problems with the Department's calcula-

tion of CSXT's stock and debt value. For example, CSXT argues that there is a disconnect between stock and debt values and the value of the taxable assets being valued in this case. CSXT points out that a company's stock price inevitably includes intangible values and assets not in existence on the date of the assessment, whereas an appraiser is only supposed to value tangible operating assets that are in existence as of the date of the appraisal.

As the court has previously indicated, it was proper for the Department to use the stock and debt approach to come up with a range of values for CSXT. *See Bair*, 815 F.Supp. at 1239 (approving of the use of the stock and debt approach in the appraisal of a railroad). The court, moreover, has already held that CSXT may not challenge the Department's chosen valuation methods.

In addition to criticisms of the stock and debt approach generally, CSXT argues that the stock and debt approach is not appropriate in this case because CSXT is not a publicly traded company. Although the stock of CSX Corporation is publicly traded and CSXT is wholly-owned by CSX Corporation, CSXT claims that it is difficult to identify a stock value attributable to CSXT' s railroad assets.

The court finds this argument unpersuasive. The mere fact that the Department must calculate and allocate a portion of CSX Corporation's stock to CSXT does not justify rejecting the Department's stock and debt value. Notably, CSXT does not argue that the Department allocated the wrong proportion of CSX Corporation's equity to CSXT. In fact, it appears to the court that the parties agree that CSXT constitutes between 75–80% of CSX Corporation's total equity. CSXT's own expert, Mr. Tegarden, attributed 78.9% of CSX Corporation's total equity to CSXT when he calculated the discount rate in his yield capitalization approach.[12]

12. In other parts of its brief, CSXT suggests that the Department may have miscalculated

CSXT's final argument is that the Department erred by failing to make an adjustment to reflect the liquidity of stocks, as opposed to assets. CSXT points out that it is easier to buy a few units of stock, as opposed to the entire operating assets of a railroad. Because it is easier to buy stock, shares of stock reflect a liquidity premium that is not shared by the hard assets of a company.

Even if the court were to conclude that CSXT was correct, CSXT failed to present any expert testimony attesting as to how large an illiquidity discount the Department should have applied. At most, Mr. Tegarden's report suggests that an illiquidity discount plus an adjustment for minority interests of 37.5% may be appropriate.[13] Pl.'s Ex. 1 at 60, n. 46 ("Some studies have suggested that the effect of these two adjustments would be a reduction of the stock prices by approximately 37.5%."). This statement, however, is not specific to CSXT, nor does the court construe it as Mr. Tegarden's opinion regarding the actual illiquidity discount that should be applied to CSX Corporation's stock. In fact, Mr. Tegarden failed to include an illiquidity discount when arriving at his own stock and debt value.[14]

Nor is the court convinced that an illiquidity discount should be applied here.

While stocks are undoubtedly more liquid than the entire operating assets of CSXT, buying the entire operating assets of a company gives the purchaser something that buying a few shares of stock cannot give him: control. One of CSXT's experts, Dr. Heaton, testified that an acquiring company will sometimes pay a control premium when the acquiring company believes that they can add value (create synergy) to the existing company. To the extent that any illiquidity discount may have been necessary, it may also have been completely offset by the necessity of adding a control premium.

### (3) CSXT's Criticisms of the Department's Market Multiple Analysis

For the Department's market multiple approach, the Department identified six comparable railroads: (1) Burlington Northern, (2) Canadian National, (3) Canadian Pacific, (4) CSX Corporation, (5) Norfolk Southern, and (6) Union Pacific. The Department then multiplied the number of shares for these railroads by their year-end stock price to come up with the value of their equity. Next, the Department totaled the book value of the debt of these railroads, added the value of their equity, and subtracted cash items to derive each railroad's total market capitalization number. The Department then divided the

the amount of debt attributable to CSXT. Even if the court were to accept this criticism, as well as CSXT's liquidity criticism described later in this opinion, according to the court's calculations the unit value of CSXT would be approximately $7.6 billion. This number is much higher than the $6 billion value proposed by CSXT.

Further, the court notes that the value of CSX Corporation's debt is $8.296 billion. If the court were to attribute 75% of CSX Corporation's debt to CSXT, the value of CSXT would be $6.2 billion. If, as CSXT claims, the value of CSXT was $6 billion, CSXT would have a negative equity value. CSX Corporation, however, held investment grade bond

ratings implying a profitability level in excess of that needed to pay both current interest expenses and the principal balance of debt.

13. If the court were to assume that CSXT's stock has a value in the market that is 37.5% higher than its underlying assets, according to the court's calculations the Department's stock and debt value of CSXT would be approximately $9.3 billion, much higher than Mr. Tegarden's $6 billion value for CSXT.

14. In his appraisal report, Mr. Tegarden valued CSXT under the stock and debt approach at $9.637 billion. He testified that he gave little to no weight to this value because it did not include an illiquidity discount.

total market capitalization number for each railroad by three different measures of income: revenues, EBIT,[15] and EBITDA.[16] This resulted in "multiples," which the Department applied against the same measures of income for CSXT to estimate the value of CSXT. The Department's market multiple values of CSXT were: (1) $12,246,460,000; (2) $10,769,011,960; and (3) $8,474,781,660 respectively.

CSXT primarily complains that the Department's calculation of its market multiple values is erroneous because the Department failed to make adjustments to its calculations to account for differences between these companies and CSXT. For example, CSXT argues that the Department failed to account for differences between the size of the comparator railroads and CSXT, whether they are eastern or western railroads, and the total amount of their assets. According to CSXT, if the Department had made the appropriate adjustments to reflect the differences between those railroads and CSXT, the appropriate market multiple value of CSXT would be approximately $6.08 billion.

Although the court applauds the Department's use of publicly traded Class 1[17] major railroads as comparable companies, the court finds that the Department erred when it failed to make adjustments to the size of the comparator companies. CSXT, however, has failed to introduce sufficient evidence for the court to determine what the appropriate adjustments should have been. At trial, CSXT introduced into evidence Plaintiff's Exhibit 51, which purports to adjust the values of Burlington Northern, Norfolk Southern, and Union Pacific to account for their size in comparison to CSXT. In addition to the fact that it

does not make adjustments for all of the railroads used by the Department, it is not clear to the court whether the exhibit properly adjusts CSXT's size to account for the purchase of Conrail. Nevertheless, because the Department erred in calculating its market multiple approach, the court will disregard the values the Department arrived at under its market multiple approach.

(4) *CSXT's Criticisms of the Department's Add–Back to Account for CSXT's Leased Equipment*

CSXT, like most railroads, leases substantial numbers of "rolling stock," such as locomotives and freight cars. The Conrail transaction was also structured using leases. CSXT uses operating leases to pay for various Conrail road assets. To account for this leased equipment and the Conrail road assets, the Department added $607 million to the unit value of CSXT under each of its valuation methods.

According to CSXT, the addition of $607 million to account for CSXT's leased assets is unnecessary because the Department's unit value of CSXT under all three valuation methods includes the value of all operating property owned or used by CSXT, including its leased assets. CSXT also argues that if the Department was going to treat CSXT's leased assets as if they were owned, the Department should have recognized that CSXT's capital expenditures would have increased if CSXT purchased its leased assets. If capital expenditures increased, then CSXT's cash flow would have been lower. The failure to make this adjustment to capital expenditures results in double counting the value of the leased assets.

---

**15.** "EBIT" stands for "earnings before interest and tax."

**16.** "EBITDA" stands for "earnings before interest, tax, and depreciation."

**17.** As noted by Mr. Tegarden, the two Canadian railroads, Canadian National and Canadian Pacific, have enough revenue to be considered Class 1 railroads if they were U.S. companies.

In response, the Department points out that CSXT's operating leases are off-balance sheet financing. Because the operating leases do not show up on CSXT's balance sheet, the full value of the operating leases are not captured in CSXT's stock and debt prices or in the Department's income approach, unless certain adjustments are made.

After much deliberation, the court concludes that the Department did not improperly double count CSXT's leased assets. In particular, the court finds Dr. Ifflander and Mr. Dickerson's testimony on this issue credible.

There are two types of leases: capital leases and operating leases. A capital lease generally lasts for the life of an asset and the lease can be renewed at the end of the asset's life or the asset may be acquired at a favorable price. An operating lease usually lasts for a period of time much shorter than the actual life of the asset, and the present value of lease payments is generally much lower than the actual price of the asset. At the end of the life of the operating lease, the equipment usually reverts back to the lessor.

Under standard accounting rules, a capital lease is treated like a purchase. It shows up on a company's books as an asset, and the lease obligations show up as a liability or debt. Operating leases, on the other hand, do not show up on a company's books as an asset or a debt—they are off-balance sheet.[18] Instead, payments for operating leases show up as cash outflows from operations.[19]

When a lease arrangement is treated as off-balance sheet financing, the court is satisfied that there are "real current or future cash flow consequences." *See* 1 D.R. Carmichael & Paul Rosenfield, Accountants' Handbook 33 (10th ed.2003). There are also consequences for reported earnings, book value of debt and capital, and return ratios for the company. The court finds that operating[20] and net income are lower, debt and capital for the firm are understated, and return on equity and capital are much higher. Unless an adjustment is made to the income statements to treat CSXT's leased Conrail road assets as if they were owned, the estimated market value CSXT will be understated.[21] In this case, the Department proper-

---

**18.** The term "off-balance sheet" debt has been the focus of much attention in the last few years due to the Enron scandal. One of the principal ways in which Enron was able to deceive investors as to its value was by engaging in extensive off-balance sheet financing transactions, which shifted debt off Enron's balance sheet, making the company's balance sheet look far stronger than it actually was. *See* Lawrence E. Mitchell, *The Sarbanes–Oxley Act and the Reinvention of Corporate Governance?* Vill. L.Rev. 1189, 1212 (2003).

**19.** "Off-balance sheet financing has been used for many years as a source of capital financing for acquiring heavy equipment, especially aircraft...." John C. Murray, *Recharacterization and Title Issues in Synthetic Leasing Transactions,* 479 Practicing L. Inst./Real Est. Handbook 889 (2000).

**20.** Operating income is a key input in both parties' valuation methods, but especially the DCF method.

**21.** The court is aware of the fact that the Southern District of Iowa in *Burlington Northern Railroad Co. v. Bair,* 815 F.Supp. 1223, 1231 (S.D.Iowa 1993), reached a seemingly different conclusion. Although the *Bair* decision is not binding upon this court, the court points out that the *Bair* court's analysis on this issue is rather perfunctory. Further, in *Bair,* the court appears to have held that because commercial and industrial personal property is exempt from taxation, adding it back to the state's unit value estimations improperly double-counts the value of the leased rolling stock. *Id.* at 1231. In Georgia, however, taxable property is defined as "all real property, including but not limited to leaseholds, interests less than fee, and all personal property...." O.C.G.A. § 48–5–3. Further-

ly made such an adjustment—$607 million to the unit value of CSXT under each of the Department's valuation methods.[22]

### E. The Court's Conclusions Regarding the True Market Value of CSXT

After parsing through days of expert testimony, the court concludes that the Department's DCF value as set out in its Proposed Valuation is the most accurate indicator of CSXT's unit value. As a result, the court holds that, for purposes of applying the 4–R Act to the defendants' assessments of CSXT, the true market unit value of CSXT for the tax year 2002 was $7,726,293,350.[23]

The court finds that the portion of CSXT's true market value that should be allocated to Georgia for the tax year 2002 is 7.194059%. The true market value of CSXT's taxable rail transportation property in Georgia for the tax year 2002, therefore, was $509,560,171.[24]

Determining the true market value of CSXT does not end the inquiry. CSXT is only entitled to relief if the "ratio of [its] assessed value to [its] true market value ... exceeds by at least 5% the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction." 49 U.S.C. § 11501(c). The parties have stipulated that the ratio of assessed value to true market value for all other commercial and industrial property in Georgia is 40%. For CSXT to succeed against the defendants, therefore, the ratio of assessed value to true market value of CSXT's rail transportation property in each assessment jurisdiction must be at least 42%.[25]

Regardless of whether the assessment jurisdiction is the county or the state, the ratio of assessed market value to true market value for CSXT's rail transportation property is less than 42%. As a result, the court concludes that the defendants have not discriminated against CSXT in violation of 49 U.S.C. § 11501(b)(1).

more, Georgia law also states that a railroad's rolling stock and other personal property appurtenant to the rolling stock shall be taxed on "as much as the whole value of the rolling stock and personal property as the length of the railroad in this state bears to the whole length of the railroad, without regard to the location of the head office of the railroad...." O.C.G.A. § 48–5–520. Thus, there does not appear to be a comparable tax exemption in Georgia.

22. Except for arguing that no adjustment is necessary, CSXT has offered no evidence as to what the amount of the adjustment should have been.

23. The court arrived at this number by taking the Department's $8,126,293,350 DCF value for CSXT and subtracting $400 million to account for CSXT's intangible property.

24. The court reached this number by taking the $7,726,293,350 true market unit value of

CSXT and allocating 7.194059% to Georgia. The court then deducted $4,156,193 to account for CSXT's motor vehicles, $2,907,467 to account for pollution control, and $39,210,271 to account for W & A exempt line.

25. Section 11501(c) states that relief may be granted under this section "only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5% the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction." Once the 5% threshold is satisfied, the court is empowered to prevent all discrimination against the railroad. The 5% threshold is calculated by measuring 5% of 40%, which yields two percentage points. See Southern Railway Co. v. State Board of Equalization, 712 F.Supp. 1557, 1565–66 (N.D.Ga.1988).

IV. *Whether the Defendants Singled Out CSXT for Discriminatory Treatment by Applying a Higher Valuation Approach to CSXT's Property than the Valuation Approach Applied to Other Centrally–Assessed Taxpayers in Georgia for the Tax Year 2002 in Violation of 49 U.S.C. § 11501(b)(4)*

The provisions of 49 U.S.C. § 11501(b)(4) forbid the imposition of any tax that discriminates against a railroad. The United States Supreme Court has held that when railroads are singled out for discriminatory treatment, discrimination under 49 U.S.C. § 11501(b)(4) has occurred. *See Department of Revenue of Oregon v. ACF Industries, Inc.,* 510 U.S. 332, 346–47, 114 S.Ct. 843, 851, 127 L.Ed.2d 165 (1994).

■ CSXT claims that it has been singled out for discriminatory treatment because the Department did not attempt to assess the fair market value of other centrally-assessed taxpayers. Instead, CSXT claims that other centrally-assessed taxpayers are being taxed at whatever the Department determines is the lowest estimate of value that it could reasonably accept. CSXT argues that it is entitled to taxation on the same basis as these other centrally-assessed utilities-taxation based on the lowest possible value.

CSXT also argues that it has been treated differently than Norfolk Southern, the only other major railroad in Georgia. As evidence of this discrimination, CSXT points out that the Department consistently valued Norfolk Southern higher than CSXT, yet in the course of other litigation, the Department agreed to value Norfolk Southern at less than $8.2 billion for the tax year 2002.

A. *Whether CSXT Has Been Taxed Differently Than Other Centrally–Assessed Taxpayers*

CSXT first claims it has been singled out for discriminatory treatment because the Department's assessments of non-railroad centrally-assessed taxpayers are not based on the appraiser's opinion of the fair market value of those properties. In support of this claim, CSXT points out that Mr. Dickerson testified that he prepared proposed assessments for non-railroad utilities that represented the "lowest number he could come up with" and a "number at the lower end of his range of fair market value." Presumably because CSXT can come up with a lower number for its value than the Department, CSXT argues that it was treated differently than other centrally-assessed taxpayers.

The court finds CSXT's argument unpersuasive. The evidence at trial showed that in preparing the Department's proposed valuations of CSXT and other taxpayers subject to the unit rule method, Mr. Dickerson first determined the range within which he thought a particular company's fair market value could lie and then chose a number at the lower end of this range. CSXT was treated in the same manner as other public utilities; Mr. Dickerson came up with a range of values for CSXT and then picked a number that was closest to the lower end of that range. Further, the evidence at trial showed that Mr. Dickerson used essentially the same valuation methods to determine the unit value of all taxpayers subject to the unit rule method. The court finds Mr. Dickerson's testimony on this issue to be credible.

Moreover, the fact that CSXT could come up with a lower number than the Department is meaningless. The Department did not base its valuation of other centrally-assessed taxpayers on the lowest number those taxpayers could come up with.[26] Instead, centrally-assessed taxpay-

---

**26.** The court has no doubt that other centrally-assessed taxpayers could have come up with values lower than Mr. Dickerson's proposed valuation of their property.

ers were taxed at the lowest number that Mr. Dickerson could come up with, just as CSXT was.

As further evidence that CSXT has been singled out for discriminatory treatment, CSXT argues that the Department's Proposed Valuation for 2002 is 47.1% higher than CSXT's 2001 assessment, whereas other non-railroad centrally-assessed taxpayers suffered only minimal increases. According to CSXT, this large increase was primarily caused by the exceedingly high terminal growth rate that Mr. Dickerson used in his DCF approach.

The fact that CSXT's 2002 assessment was 47.1% higher than its 2001 assessment, and that this percentage increase is much higher than the percentage increase of other centrally-assessed taxpayers, does not in and of itself show that CSXT has been discriminated against. An equally likely proposition is that CSXT was undervalued in 2001. Further, absent evidence of the fair market value of CSXT in 2001 or the fair market value of other taxpayers in 2002, the court cannot determine that CSXT has been singled out for discriminatory treatment.

Mr. Dickerson, moreover, testified that the largest part of the increase in CSXT's 2002 assessment was due to a change he instituted that year for all railroads, which was not needed for non-railroad public utilities. Specifically, he began using income data taken from CSX Corporation's annual reports instead of CSXT's R–1 [27] reports to project future cash flows in his DCF analysis. Because those income figures can differ significantly from each other, the choice of which to use can greatly affect the DCF indicator of value. The evidence at trial showed that CSX Corporation's annual reports reflect management's view of CSXT's financial performance.

Finally, CSXT argues that the Department's treatment of other centrally-assessed taxpayers for the tax year 2004 is potent evidence that CSXT was singled out in 2002. In the tax year 2004, Mr. Dickerson devised a new way of calculating the risk premium for centrally-assessed taxpayers, which he then applied to his valuation worksheets for the tax year 2004. This new calculation increased the Department's initial valuation of the majority of centrally-assessed taxpayers, which, in turn, caused a "stir." The Department, in an attempt to avoid litigation, had a meeting with six representatives from centrally-assessed taxpayers, including CSXT. At the conclusion of the meeting, CSXT and the other five companies agreed that for the tax year 2004, all centrally-assessed taxpayers would receive an assessment equal to their assessment for the previous year or the average of their past three years of assessments, whichever was greater. For 2004, CSXT was assessed at $6.5 billion, a slight increase over the Department's 2001 assessment. Because the Department reverted to CSXT's 2001 values in 2004, CSXT argues that this is an indication that CSXT was singled out for different tax treatment in 2002 and 2003.

The Department's 2004 assessment of CSXT indicates little about the Department's 2002 valuation of CSXT. The Department negotiated an agreement with all public utilities in 2004 to avoid litigation. The agreement mandated that these taxpayers receive an assessment equal to their assessment for the previous year or the average of their past three years of assessments. As a practical matter, the Department could not have used either formula for CSXT because CSXT had filed suits challenging the Department's 2002 and 2003 valuations. The only avenue left

---

**27.** An R–1 report is a report made by a rail- road, such as CSXT, to the STB.

to the Department was to revert to CSXT's 2001 assessment.

### B. Whether CSXT Has Been Treated Differently Than Norfolk Southern

█ CSXT next argues that it has been treated differently than the only other major railroad in Georgia, Norfolk Southern. Like CSXT, Norfolk Southern filed suit against the defendants challenging the Department's 2002 assessment. The Department, however, settled Norfolk Southern's lawsuit and agreed to only minimal increases in value over the Department's 2001 assessment of Norfolk Southern. Ultimately, this meant that Norfolk Southern's 2002 value in Georgia was less than $8.2 billion.

CSXT argues that valuing Norfolk Southern less than CSXT for the tax year 2002 is wrong and discriminatory. CSXT points out that the Department consistently valued Norfolk Southern higher than CSXT for the tax years 2002–2004 and consistently projected higher cash flows for Norfolk Southern. If the Department truly believed that Norfolk Southern was worth more than CSXT, how, asks CSXT, could the Department assert in this suit that CSXT's value is higher than the agreed-to value of Norfolk Southern for the tax year 2002?

The court finds CSXT's arguments unpersuasive. Nothing in the 4–R Act requires the court to compare the treatment of CSXT to just one company, another railroad. In *Atchison, Topeka, and Santa Fe Railway*, 78 F.3d at 442, the railroad argued that the court could measure whether Arizona's tax statutes discriminated against it solely by looking at the treatment of other motor carriers, as opposed to comparing all commercial and industrial taxpayers. The Ninth Circuit rejected this argument stating, "Although subsection(b)(4) is silent as to the proper comparison class, congressional intent behind the 4–R Act dictates that the comparison class of 'other commercial and industrial taxpayers subject to the tax' be used." *Id.*

The court finds the logic of the Ninth Circuit persuasive. By narrowing the comparison class to just one company, CSXT attempts to greatly expand the reach of the 4–R Act and increase the likelihood of future litigation. Accordingly, the court finds that it is improper to compare CSXT's treatment to just one other company, Norfolk Southern, for purposes of determining whether CSXT has been discriminated against in violation of the 4–R Act.

Even if it was proper to compare solely CSXT and Norfolk Southern, the court still finds that CSXT has not been singled out for discriminatory treatment. CSXT did not present any evidence that it was treated differently than Norfolk Southern when the Department made its initial proposed valuation of Norfolk Southern. If anything, the fact that Norfolk Southern also filed suit challenging the Department's proposed valuation suggests that Norfolk Southern was treated similarly to CSXT.

In addition, the fact that the Department ultimately settled with Norfolk Southern does not compel the court to conclude that CSXT was treated differently from Norfolk Southern. Lawsuits are settled for numerous reasons, including the need to allocate scarce legal resources differently.

### V. Whether the Department Improperly Included the Value of CSXT's Intangible Property in Its Proposed Valuation in Violation of 49 U.S.C. § 11501(b)(4)

█ CSXT's last claim is that the Department's Proposed Valuation includes amounts attributable to intangible property that is not taxed to locally-assessed

taxpayers, resulting in a violation of 49 U.S.C. § 11501(b)(4). When a railroad is valued as a unit on a going concern basis, it is undisputed that the unit value of that railroad necessarily includes all of the railroad's assets, both tangible and intangible. The trend in a majority of states, however, is to exclude intangible property from ad valorem taxation. In 1996, the state of Georgia followed this trend and repealed its ad valorem tax on intangible property. *See* O.C.G.A. § 48-6-21. Thus, the intangible property of CSXT is not taxable in Georgia.

As an initial matter, the court must address the definition of the term "intangible property." Intangible property is generally defined as property that lacks a physical existence, such as stock options and business goodwill. *Black's Law Dictionary* 1253 (8th ed.2004). The court is not aware of any decision by the Georgia Department of Revenue or by Georgia courts that articulates a list of property included within the definition of "intangible property" for purposes of tax valuation. Under the repealed Georgia statute subjecting intangible property to an ad valorem tax, the Georgia legislature defined intangible property as:

(1) Money;

(2) Collateral Security Loans;

(3) Stocks;

(4) Accounts receivables and notes not representing credits secured by real estate;

(5) Bonds and debentures of all corporations;

(6) Long term notes secured by real estate;

(7) Short term notes secured by real estate;

(8) Restricted foreign intangibles;

(9) Patents, copyrights, franchises, and all other classes of intangible personal property not otherwise enumerated; and

(10) Computer software defined by statute.

O.C.G.A. § 48-6-21.

Although it has been repealed, O.C.G.A. § 48-6-21 is an indication that the Georgia legislature believed that the assets listed above constitute intangible property. Further, by repealing the statute, the legislature implicitly indicated that these types of intangible property were no longer subject to taxation. The court, therefore, finds that, at the very least, the list of property included in O.C.G.A. § 48-6-21 is a good starting point for defining the term "intangible property."

Despite the repeal of O.C.G.A. § 48-6-21, CSXT claims that its intangible property has been included within the Department's Proposed Valuation. The Department admits that its unit valuation of CSXT initially included CSXT' s tangible and intangible property, but claims that it deducted $400 million from its unit value to account for CSXT's intangible property.

Instead of attempting to identify and value its intangible property, CSXT contends that it is impractical to identify and value its intangible property, and, thus, the court should require the Department to use the yield capitalization approach, which CSXT contends does not compound intangibles. CSXT claims that the court should require the defendants to use the yield capitalization approach because the Department's market multiple and stock and debt approaches allegedly unnecessarily compound intangible values.[28] For exam-

---

**28.** It is undisputed here that the Department does not and did not intend to value the intangible property of other commercial and industrial property. It is also undisputed that all three of the valuation methods used by the Department initially included the value of CSXT's intangible property.

ple, CSXT has presented evidence that a company's stock prices may increase when that company hires a new CEO. This increase in the stock price is not attributable to tangible assets. Because the stock and debt and the market multiple approaches both rely on a company's stock price,[29] they compound intangible assets.

As support for its argument that the court should adopt the yield capitalization approach, CSXT cites to a decision by the Utah Tax Commission ("Commission") in *WilTel, Inc. v. Beaver County*, Nos. 95–0789 and 95–0824 (Utah Tax Commission December 5, 1997)(*"WilTel II"*). WilTel, Inc. is a provider of long-distance telecommunications services. In 1995, the Utah State Property Tax Division (the "Division") calculated WilTel's unit value based on the stock and debt and income approaches. WilTel appealed the assessment to the Utah Tax Commission and moved for partial summary judgment arguing, in part, that Utah's assessment improperly included intangible property, which was not taxable under Utah law. *WilTel, Inc. v. Beaver County*, No. 95–0789, 1997 Utah Tax LEXIS 111, at *2–3 (Utah Tax Commission April 21, 1997) (*"WilTel I"*). The Utah Tax Commission found that the income and stock and debt approaches tend to compound intangible values. The Utah Tax Commission then remanded the case to the parties to identify, value, and remove WilTel's intangible property using the cost approach." *Id.* at *14–15.

On remand, the parties were unable to agree on the valuation of WilTel's tax-exempt intangible property, and, thus, the matter came before the Utah Tax Commission again for a formal hearing to determine the value of WilTel's intangible property. *WilTel II* at *2. The Commission finally concluded that "separately valuing intangibles and deducting them from a unit valuation is impractical." *WilTel II* at *3. In an attempt to minimize the inclusion of intangibles in the unit rule method, the Utah Tax Commission concluded that the parties should use a yield capitalization approach and a cost approach and that each approach should be weighted at 50%. The Utah Tax Commission then remanded the case to the Division to calculate the value of WilTel under a yield capitalization approach (minus growth) and to time adjust its cost approach. *WilTel II* at *6.

While the *WilTel II* decision is attractive because of its simplicity, the court finds that the reasoning of *WilTel II* is not appropriate in this case. First, this is a case brought under the 4–R Act, and not merely an appeal of a state tax valuation. The court has already held that CSXT may not challenge the Department's valuation methods in this case. If this court were to adopt the reasoning of *WilTel II,* the court would be dictating to the Department a particular valuation method.

Second, CSXT has not convinced the court that it is impossible or impractical to value its intangible property. While CSXT's local assessment expert, Ms. Judith Ross, testified that identifying and valuing a company's intangible property would be extremely difficult, she also testified that performing a unit valuation in general is difficult. Ms. Ross further testified that intangible property can be identified and valued by a person with expertise. Thus, the court finds that it is not impractical or impossible to identify and value CSXT's intangible property.

Third, while the court believes that the stock and debt approach undoubtedly includes value attributable to intangible property in its initial unit value, the court

---

29. For clarification purposes, unlike the stock and debt approach, the market multiple approach relies on the stock prices of compara-ble companies, as opposed to CSX Corporation's stock prices.

also finds that the yield capitalization method touted by CSXT includes some value attributable to intangible property. In fact, CSXT has admitted that Mr. Tegarden's yield capitalization value includes some value attributable to intangible property. This is further illustrated by the fact that CSXT deducts $400 million from Mr. Tegarden' s unit value of CSXT—the same $400 million deduction that the Department took to account for certain intangibles owned by CSXT.

Fourth, this case differs[30] from the *Wiltel* decisions in that in *Wiltel I*, the Utah Tax Commission remanded the case so that the taxpayer could identify its intangible property. The parties, however, could not agree on the value of Wiltel's intangible property. In this case, CSXT has not even presented any evidence that it owns intangible property.

Here, it is undisputed that Mr. Dickerson deducted $400 million from his unit value of CSXT to account for certain intangibles. He testified that the $400 million deduction was his attempt to eliminate the value of CSXT's intangible property that was previously separately taxed under O.C.G.A. § 48–6–21. When asked why he did not attempt to value and deduct other intangible property from his initial assessment, Mr. Dickerson testified that CSXT did not present the Department with any evidence that CSXT owned other intangible property. Consistent with its statement to Mr. Dickerson, at trial CSXT

failed to identify any specific intangible property that it owned as of January 1, 2002.[31] CSXT also failed to present evidence as to how much its intangible property was worth. *Cf. Burlington N. R.R. Co. v. Huddleston,* 94 F.3d 1413, 1415 (10th Cir.1996) (in its complaint alleging a violation of the 4–R Act, the railroad also alleged that the value of its intangible property, computer software, was at least $8 million); *Bair,* 815 F.Supp. at 1239 (separately identifying and valuing intangible property of a railroad for purposes of 4–R Act claim). Nor has CSXT provided the court with any evidence that the Department's $400 million intangible property deduction was under-inclusive.

The court, therefore, concludes that CSXT has not carried its burden of showing by a preponderance of evidence that the Department improperly included intangible property in the Department's Proposed Valuation of CSXT.

*Conclusion*

For the reasons discussed above, the court concludes that the defendants have not discriminated against CSXT in violation of 49 U.S.C. § 11501(b)(4).

The court also holds that the true market unit value of CSXT for the tax year 2002 was $7,726,293,350.[32] The true market value of CSXT's taxable rail transportation property in Georgia for the tax year 2002 was $509,560,171.[33] The defendants,

---

**30.** The court also notes that holdings in the *WilTel* cases are not binding upon this court for numerous reasons: (1) the *Wiltel* decisions were made by the Utah State Tax Commission; (2) the taxpayer in the *Wiltel* cases was a telecommunications company, not a railroad; and (3) the *Wiltel* cases were not decided under the 4–R Act.

**31.** For example, CSXT did not provide the court with any evidence that it owns any trademarks, copyrights, or patents.

**32.** The court arrived at this number by taking the Department's $8,126,293,350 DCF value for CSXT and subtracting $400 million to account for CSXT's intangible property.

**33.** The court reached this number by taking the $7,726,293,350 true market unit value of CSXT and allocating 7.194059% to Georgia. The court then deducted $4,156,193 to account for CSXT's motor vehicles, $2,907,467 to account for pollution control, and $39,210,271 to account for W & A exempt line.

therefore, have not discriminated against CSXT in violation of 49 U.S.C. § 11501(b)(1) because the ratio of assessed value to true market value of CSXT's property does not exceed the jurisdictional threshold set out in the 4–R Act of 42%. Thus, CSXT is not entitled to relief under the 4–R Act for the tax year 2002.

The clerk is DIRECTED to close this file and issue judgment for the defendants in accordance with this order.