SOUTHERN RAILWAY COMPANY, et al., Plaintiffs-Appellants, Cross-Appellees,

United States of America, Plaintiff-Appellant,

v.

STATE BOARD OF EQUALIZATION, etc., et al., Defendants-Appellees, Cross-Appellants.

No. 81–7925.

United States Court of Appeals, Eleventh Circuit.

Sept. 19, 1983.

Hansell, Post, Brandon & Dorsey, Atlanta, Ga., Charles T. Zink, Joseph L. Lenihan, Louisville, Ky., for Seaboard, Louisville & Nashville RR.

Laughlin, Halle, Clark & Gibson, Everett B. Gibson, Gregory G. Fletcher, Memphis, Tenn., Hall, Bloch, Garland & Meyer, Benjamin M. Garland, Macon, Ga., for all other plaintiffs-appellants, cross-appellees.

Smith, Cohen, Ringel, Kohler & Martin, Marion Smith, II, H. Perry Michael, Sr. Asst. Atty. Gen., James C. Pratt, Asst. Atty. Gen., Atlanta, Ga., for defendants-appellees, cross-appellants.

Dina R. Lassow, U.S. Dept. of Just., Civ. Div., Anthony J. Steinmeyer, Washington, D.C., for U.S.

Before FAY and VANCE, Circuit Judges, and ALLGOOD *, District Judge.

VANCE, Circuit Judge:

In this case we are asked to decide whether the district court properly abstained from hearing a case brought before it under section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31, 54 (1976) (codified with some differences in language at 49 U.S.C. § 11503) (the 4R Act or the Act).[1] That provision prohibits a state or

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. Section 306 of the 4R Act was originally codified in the Interstate Commerce Act at 49 U.S.C. § 26c. Although the Act became law on February 5, 1976, the effective date of section 306 was set for three years after that date to give the states time to bring their property tax laws into conformity with the Act. Pub.L. No. 94–210, 90 Stat. 31, 54 (1976) (originally codified at 49 U.S.C. § 26c(2)(b)). In the intervening period the Revised Interstate Commerce Act of 1978, Pub.L. No. 95–473, 92 Stat. 1337 (1978) recodified subtitle IV of the Interstate Commerce Act placing section 306 of the 4R

Act at 49 U.S.C. § 11503. 92 Stat. at 1337, 1445–46. Despite the recodification's major changes in the wording of section 306 the stated legislative purpose of the Revised Interstate Commerce Act was to make changes in terminology and style without causing any substantive change. H.R.Rep. No. 1395, 95th Cong., 2d Sess. 9–10, reprinted in 1978 U.S.Code Cong. & Ad.News 3009, 3018–19. See also H.R.Rep. No. 1395 at 8, reprinted in 1978 U.S.Code Cong. & Ad.News at 3017 (letter of Edward F. Willett, Jr., Law Revision Counsel, placed in the report by Committee Chairman Rodino):

Under the proviso of section 204(a) of title 1, positive law titles of the United States Code are legal evidence of the law. Even if the

subdivision thereof from assessing rail transportation property at a value that has a higher ratio to the true market value of that property than does the assessed value of other commercial and industrial property in the state or subdivision. Section 11503 of the codified 4R Act also makes it unlawful to levy or collect taxes on rail property assessed in this discriminatory manner. The section confers concurrent jurisdiction on federal district courts to enforce its provisions.

## I. Preliminary Matters.

The private appellants in this case are nine interstate rail carriers (the railroads) owning property in the state of Georgia.[2] Relying on a sales ratio study prepared by the Georgia Department of Audits which showed that, in the aggregate, local nonrailroad property in many Georgia counties in 1979 was preferentially assessed at a value far below the forty percent of fair market value required by state law the railroads brought this action in federal district court

to enjoin the issuance by the Georgia State Board of Equalization (the state board) of an order which allegedly would result in the assessment of their property in a discriminatory manner.

Prior to bringing this suit the railroads appealed their proposed assessments for 1979 to the state board under the procedure Georgia provides for that purpose. *See* Ga. Code Ann. § 48–2–18 (1982), *amended by* § 48–2–18 (Supp.1983); Ga.Code Ann. § 48–2–46 (1982).[3] The designated hearing examiner rejected claims made by some of the railroads that their property was valued far in excess of its true market value but found on the basis of the sales ratio study that many counties discriminatorily assessed local nonrailroad property below the forty percent of true market value required by law. As a consequence, the examiner recommended that the assessment percentages applied to each railroad's system value be reduced correspondingly in those counties.[4]

---

language used in the codification *appears* to make a substantive change, the courts will look to the predecessor statute and legislative history if necessary to interpret the language of the codification.

(emphasis in original). We shall read section 11503 in light of section 306 and the legislative history resolving ambiguities in favor of the original language. *Cf. Atchison, T. & S.F. Ry. v. Lennen,* 640 F.2d 255, 258 (10th Cir.1981). The approach fulfills the purpose of the recodification which was to attain uniformity within the title and reduce awkward and obsolete terms without affecting the substance of any previously enacted statutes.

2. In its answer to the railroads' complaint the state board challenged the constitutionality of section 11503. Consequently the United States requested and was granted leave to intervene pursuant to 28 U.S.C. § 2403(a) (1976) in order to defend the Act. After the United States intervened the state board abandoned its direct attack on the Act's constitutionality. This abandonment is, however, partial. The state board still argues that under *Moses Lake Homes, Inc. v. Grant County,* 365 U.S. 744, 81 S.Ct. 870, 6 L.Ed.2d 66 (1961), a federal court cannot constitutionally grant the relief mandated by the Act.

3. In 1982 Georgia recodified its laws. Although at all times relevant to this appeal the old code was in effect, for convenience all cita-

tions to Georgia laws are to the new codification. Any discrepancies between the old and new codes are not relevant to this appeal.

4. In his report and recommendation the hearing examiner discussed section 306 of the 4R Act but found it inapplicable because "[t]he railroads offered no evidence of the prevailing level of assessment of commercial and industrial property in the State as a whole or in any county. Absent such evidence the prevailing level of assessment for such property as a discrete class is presumptively at 40% of value. *Hardin v. Reynolds,* 189 Ga. 534, 6 S.E.2d [328] (1939). Hence, the discrimination prohibited by 49 U.S.C. § 11503 has not occurred." Thus the hearing examiner based his recommendation of equalization, which the state board refused to adopt, not on federal law but on state law. We further note that section 11503 may shift the burden to the state to show that all other commercial and industrial property was properly assessed after presentation of the sales assessment ratio showing the railroad's assessment value exceeded that of all other property. *See Clinchfield R.R. v. Lynch,* 700 F.2d 126, 132–34 (4th Cir.1983). Regardless of the possibility of burden shifting, where a more specific ratio study is unavailable, a general ratio such as the one used by the railroads in this case showing a five percent assessment discrepancy is a sufficient ground for jurisdiction although not necessarily conclusive of the

On April 15, 1981, in summary fashion, the state board approved and accepted all recommendations of the examiner except those which would eliminate the disparity between locally assessed property and rail property in the counties where the ratio study showed locally assessed property to be undervalued. The board gave no reasons for this rejection but implicitly ruled that, despite the significant discrepancies evidenced by the sales ratio study, the county assessments were "reasonably uniform" under Georgia law.[5] After the board announced its decision but before it could issue an order the railroads filed this action.[6] The district court's subsequent restraining orders and injunctions continue to prevent the board from issuing its order assessing the railroads property taxes.[7]

## II. Property Tax Assessment in the State of Georgia.

The Georgia state revenue commissioner assesses utilities including railroads centrally. See Ga.Code Ann. §§ 48–5–510 through –524 (1982). Other commercial and industrial property is assessed by the county in which it is located. These local assessments are performed by the various county boards of tax assessors. See Ga.Code Ann. §§ 48–5–290 through –313 (1982 & Supp.1983). The state revenue commissioner by law must require all counties to assess property uniformly. Hawes v. Conner, 224 Ga. 567, 163 S.E.2d 724, 726 (1968). The degree of uniformity required is styled "reasonable uniformity." See Strickland v. Douglas County, 246 Ga. 640, 272 S.E.2d 340, 342 (1980). The commissioner's decision that assessments within a given county should be increased, decreased or left unchanged must be upheld by reviewing courts unless the action is "unreasonable, beyond his authority or constitute an abuse of discretion." Id.

## III. Protections Afforded Railroads by the 4R Act.

Section 11503 grants federal courts concurrent jurisdiction to impose sanctions once a railroad shows that the ratio of assessed value to true market value of its property exceeds by at least five percent the assessed value to true market value of other commercial and industrial property within the taxing jurisdiction. Once this five percent jurisdictional threshold has

actual discrepancy existing or the measure of relief to be granted if adequately rebutted by the state board. See Clinchfield R.R. v. Lynch, 527 F.Supp. 784 (E.D.N.C.1981), aff'd, 700 F.2d 126 (4th Cir.1983).

**5.** It is unclear under Georgia law what percentage discrepancy between railroad assessments and the average assessment of all other commercial and industrial property within a taxing subdivision would be sufficient to show as a matter of law that the railroads deserved equalization.

**6.** The fact that the state proceeding was still in progress when appellants sued in federal district court does not affect the district court's jurisdiction. See, e.g., Colorado River Water Conservation Dist., 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976); Ramos v. Lamm, 639 F.2d 559, 565 (10th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). The state board argues that the railroads should be confined to the state forum because that is where they chose to raise the section 11503 claim. The railroads argue that, under Missouri Pacific Railroad v. Tax Division, 504 F.Supp. 907 (E.D.Ark.1980),

they feared their section 11503 claim would otherwise be deemed waived. The combination of the election of remedies doctrine advanced by the state board and the possibility of waiver under Missouri Pacific would effectively deprive federal courts of jurisdiction to hear section 11503 cases contrary to congressional intent. Cf. Alexander v. Gardner-Denver Co., 415 U.S. 36, 48–50, 94 S.Ct. 1011, 1019–1020, 39 L.Ed.2d 147 (1974) (Title VII cause of action not forfeited by arbitration of grievance under nondiscrimination clause of collective bargaining agreement). Although we need not decide the waiver issue we conclude that the railroads are not barred from advancing their claims by the doctrine of election of remedies and may proceed in federal court despite raising the identical claims in a state proceeding. This result will serve the principles of comity by encouraging railroads to bring all their tax claims first in the state tribunal. This may, if effective relief is forthcoming, eliminate the necessity for federal adjudication.

**7.** Since no final order has been issued the board's determination of the section 11503 issue is not res judicata and does not bind the district court.

been met the Act requires the court to enjoin the assessment of discriminatory taxes in any amount. The district court has explicit jurisdiction to issue injunctive relief notwithstanding the Tax Injunction Act of 1937, 28 U.S.C. § 1341.[8]

## IV. The Case Below.

The district court observed that Georgia law requires uniform valuations of all property and described in detail Georgia's appellate procedure in property tax cases. The court then distinguished this situation from 4R Act cases involving de jure discrimination, observing that "there is no conflict between the Georgia Revenue Code and section 306." The court further noted that "any contention by the railroads that the State Board of Equalization misapplied either federal or state law as such law relates to the tax structure imposed on the railroads would be without merit, since state law requires, and the State Board of Equalization so recognized, that uniformity of taxation is required."

After noting that the state board had considered state and federal directives "that railroad property must be treated equally with commercial and other industrial property," the court observed that the railroads' complaint did not allege "any sinister plot on the part of the State Department of Revenue to circumvent either section 306 or the Georgia statutes by purposefully valuing their properties at a value higher than the actual true market value; the complaint merely alleges that the valuations and resulting assessments are incor-

rect. Thus narrowed, the focus of the railroads' complaint is whether the valuation placed upon their property is, indeed, the fair market value."

The district court concluded that abstention was proper under *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). It justified restraint by noting that federal intervention could disrupt effectuation of the state policy of uniform taxation which in this case parallels federal law. The state's special expertise in valuation and assessment, the matter at hand, was also of relevance. The court added as a third reason for its abstention "the fact that protracted litigation could result because ... the remedy which this court can provide is severely limited."[9]

## V. The Appeal.

### A. *Burford* abstention in general.

■ " 'The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.' " *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1062–63, 3 L.Ed.2d 1163 (1959)); *accord Reetz v. Bozanich,* 397 U.S. 82, 86, 90 S.Ct. 788, 790, 25 L.Ed.2d 68 (1970); *Zwickler v. Koota,* 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444 (1967); *Baggett v. Bul-*

---

8. 28 U.S.C. § 1341:

 The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

9. The district court concluded that restrictions on the power of federal courts to assess or levy taxes under *Moses Lake Homes, Inc. v. Grant County,* 365 U.S. 744, 81 S.Ct. 870, 6 L.Ed.2d 66 (1961), "seriously restrict the measure of relief available in the district court." Congress disagrees. *See, e.g.,* S.Rep. No. 630, 91st Cong., 1st Sess. 1, 12–13 (1969). Although the issue is not directly before us and is not necessary to our decision, we believe *Moses Lake Homes* is

distinguishable. If, prior to a state assessment, a district court enjoins the assessment of property in excess of a certain judicially determined value the court is not assessing a tax. It is still incumbent upon the state's taxing agency to formally assess the rail property at some value within the terms of the district court's injunction. Even were *Moses Lake Homes* applicable we believe the court's equity powers are sufficient to grant substantial and effective relief when dealing with the discriminatory tax as an entirety. The court's equity powers are also sufficient to eliminate the incentives to engage in protracted litigation either party might otherwise have.

*litt,* 377 U.S. 360, 375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964).

 *Burford v. Sun Oil Co.* and a group of arguably similar cases have been assembled into an uneasy category of abstention to which *Burford* lends its name.[10] Although the contours of *Burford*-type abstention are ill-defined, the doctrine when applicable is invoked where the "exercise of federal review of the [state law] question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Nasser v. City of Homewood,* 671 F.2d 432, 439 (11th Cir. 1982) (quoting *Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1244); *see also BT Investment Managers, Inc. v. Lewis,* 559 F.2d 950, 954–55 (5th Cir.1977). Because *Burford* abstention results in the dismissal rather than stay of federal proceedings as well as in the "refusal to exercise federal jurisdiction in an entire class of cases, it is perhaps the most potent device in" the abstention area. *Nasser v. City of Homewood,* 671 F.2d at 440; *BT Investment Managers,* 559 F.2d at 955.

B. The propriety of abstention under the 4R Act.

 Whether *Burford* should be applied to cover challenges by rail carriers to discriminatory state property tax assessments under section 11503 is a case of first impression in this circuit. The posture of the state and federal interests is significantly different in this case than in previous abstention cases. Because we decide that Congress meant unconditionally to ensure a federal forum for section 11503 claims, we conclude that the statute bars abstention in cases alleging de facto discrimination as well as de jure.

1. The continued vitality of equitable restraint in suits involving state taxes.

Both Congress and the federal courts have acknowledged that the ability to administer fiscal affairs via taxation free of interference from the federal judiciary is of primary importance to a state's economical well-being. Federal courts had long practiced abstention or its equivalent in deference to this state interest by the time Congress passed the Tax Injunction Act, 28 U.S.C. § 1341. *See, e.g., Matthews v. Rodgers,* 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447 (1932); *First National Bank v. Board of Commissioners,* 264 U.S. 450, 44 S.Ct. 385, 68 L.Ed. 784 (1924); *Singer Sewing Machine Co. v. Benedict,* 229 U.S. 481, 33 S.Ct. 942, 57 L.Ed. 1288 (1913); *Boise Artesian Hot & Cold Water Co. v. Boise City,* 213 U.S. 276, 29 S.Ct. 426, 53 L.Ed. 796 (1909). The Tax Injunction Act was intended to codify this pre-existing federal equity practice and to ensure more uniform adherence to the underlying principles of comity by erecting a jurisdictional bar to supplement the existing equitable restraint. *See generally United Gas Pipe Line Co. v. Whitman,* 595 F.2d 323 (5th Cir.1979).[11]

The equitable doctrine has not been replaced by section 1341. Since enactment of

---

**10.** The other two categories are *Pullman*-type abstention and *Younger*-type abstention. Under the *Pullman* category, abstention may be appropriate where the resolution of a federal constitutional question properly before the federal court "is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law." *Harman v. Forssenius,* 380 U.S. 528, 534, 85 S.Ct. 1177, 1181, 14 L.Ed.2d 50 (1965); *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Abstention in a *Pullman* situation "may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication." *Harman,* 380 U.S. at 534, 85 S.Ct. at 1182. *Younger*-type abstention counsels against intervention by federal courts to restrain state criminal or quasi-criminal proceedings. *E.g., Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1974); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

**11.** Under Tax Injunction Act jurisprudence the central focus of the federal inquiry has been the adequacy of the state remedy. *Id.* It is obvious from the statutory language that this is the only possibility of gaining federal jurisdiction in a case falling within section 1341. *See, e.g., Tully v. Griffin, Inc.,* 429 U.S. 68, 73–74, 97 S.Ct. 219, 222–223, 50 L.Ed.2d 227 (1976).

the provision courts have applied an equitable policy of non-interference to suits involving state taxes when the suits are not specifically within section 1341. *See, e.g., Fair Assessment in Real Estate Association v. McNary,* 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981); *Great Lakes Dredge & Dock Co. v. Huffman,* 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943); *United Gas Pipe Line.* The justification given by courts for refusing to hear state tax cases outside the literal scope of section 1341 involves a determination that congressional intent counsels the expansion followed by a decision that equitable restraint is appropriate under the circumstances.[12] *See California v. Grace Brethren Church,* 457 U.S. 393, 412–13, 416–17, 102 S.Ct. 2498, 2510–11, 2512–13, 73 L.Ed.2d 93 (1982); *Fair Assessment,* 454 U.S. at 107 & n. 4, 109–10, 102 S.Ct. at 181 & n. 4, 182–83; *Rosewell v. LaSalle National Bank,* 450 U.S. 503, 522–27, 101 S.Ct. 1221, 1234–36, 67 L.Ed.2d 464 (1981); *Great Lakes,* 319 U.S. at 300–01, 63 S.Ct. at 1074; *United Gas Pipe Line,* 595 F.2d at 326.

2. The congressional guarantee of a federal forum for section 11503 suits.

Without doubt the well-being of the nation's railroads is essential to its economic health. In passing section 11503 Congress acted "to eliminate the long-standing burden on interstate commerce resulting from discriminatory State and local taxation of common and contract carrier transportation property." S.Rep. No. 630, 91st Cong., 1st Sess. 1 (1969).

In hearings on the provision Congress heard testimony from the National Association of Tax Administrators on behalf of the states to the effect that state court remedies were "adequate to deal effectively with assessment discrimination cases" and that

state tax departments made "substantial progress in eliminating discrimination" and that federal injunctive relief would interfere with states' abilities to classify property to carry out state policies promoting better land use, location of industry, homestead tax relief and old age property tax relief. *See* S.Rep. No. 630 at 8. Nevertheless Congress determined that strong federal policies demanded a federal forum as well as a federal substantive remedy. *Id.* at 6–7. Congress realized that the Tax Injunction Act, which prohibits district courts from enjoining state taxing activity where state law provides a plain, speedy, and efficient remedy in the state's courts, had the undesirable effect of closing the doors of the federal courts to railroads affected by discriminatory taxation where the state's remedies were neither plain, speedy, nor efficient. S.Rep. No. 630 at 6–8; S.Rep. No. 1483, 90th Cong., 2d Sess. 6 (1968). Therefore Congress provided in section 11503 a specific exemption to the Tax Injunction Act.

The state board argues that, in states such as Georgia where de jure discrimination does not exist, state and national policies are aligned and the federal judiciary should require taxpayers to use the state's remedies. We do not agree. The legislative history and broad language of the Act show Congress possessed a general concern with discrimination in all of its guises. *See* S.Rep. No. 630 at 6 (favorably quoting S.Rep. No. 445, 87th Cong., 1st Sess. 466 (1961)); S.Rep. No. 630 at 15; S.Rep. No. 445 at 458.

Section 11503 suits differ from ordinary taxpayer suits in that the potential class of section 11503 plaintiffs is limited to rail carriers. Exercise of federal jurisdiction

---

12. We refuse to accept either the state board's argument that the judiciary should exercise its equitable discretion regardless of contrary congressional intent and the railroad's argument that the courts are prevented from exercising equitable discretion because of a contrary expression of congressional intent. Because equitable considerations require the courts to consider competing federal and state policies we find that the court is not bound to follow congressional intention and hear any case for

which Congress has provided jurisdiction especially when the subject matter of a particular case coming under such a jurisdictional grant is at the periphery of congressional attention. However, we also realize that the function of the legislative branch is to create law and policy and legislative grants of jurisdiction and their legislative histories are strong evidence of federal policy which we are charged by equity as well as constitutional considerations to consider.

thus will not transform the district court into "'a source of appellate review of all state property tax classifications.'" *Fair Assessment,* 454 U.S. at 114, 102 S.Ct. at 185 (quoting *Fair Assessment in Real Estate Association v. McNary,* 478 F.Supp. 1231, 1234 (E.D.Mo.1979)). There are, however, other concerns. A judicial appraisal of valuation techniques could well affect the state's choice of future assessment methods. Further, although the railroads are relatively few in number and tend to pool their litigation efforts their combined tax bill is substantial. "During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget ...."[13] *California v. Grace Brethren Church,* 457 U.S. at 410, 102 S.Ct. at 2509 (quoting *Perez v. Ledesma,* 401 U.S. 82, 128 n. 17, 91 S.Ct. 674, 699 n. 17, 27 L.Ed.2d 701 (1971)). Litigation of section 11503 claims could also allow the railroads to "escape the ordinary procedural requirements imposed by state law." *Id.*

The extensive legislative history of the 4R Act and its numerous predecessor bills makes it clear that Congress thoroughly considered the effects the Act would have on state taxation policies and practices. After weighing these effects, Congress concluded that both a federal remedy and a federal forum were necessary to further the strong national policy of protecting interstate commerce from the disruptive effects of discriminatory state and local taxation of railroad property. *See, e.g.,* S.Rep. No. 630 at 6–8; S.Rep. No. 1483 at 6. Congress provided for both solutions in the resulting law.

"[A] court should not defer the exercise of jurisdiction under a federal statute unless it is consistent with that intent." *Patsy v. Board of Regents,* 457 U.S. 496, 501–02, 102 S.Ct. 2557, 2560–61, 73 L.Ed.2d 172 (1982). The legislative history of section 11503 demonstrates that Congress intended

to carve out an exception not only to the Tax Injunction Act, but also to the underlying doctrine of equitable restraint in the narrow area of discriminatory taxation of railroads. Congress meant to guarantee a federal forum for railroad suits, and only an exemption from abstention in all its forms would accomplish this purpose. Since Congress has spoken, it is not our province to alter the balance Congress struck in providing a federal forum for rail carrier claims of tax discrimination under section 11503.

*Fair Assessment in Real Estate Association v. McNary,* 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981), does not require a different result. In a suit for damages under section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, taxpayers claimed that disparate assessment of their newly improved real property deprived them of equal protection and due process of law. Section 1983 ordinarily provides an immediate federal forum for citizens whose constitutional or federal rights allegedly have been denied by any state despite the presence of an adequate state forum. *See McNeese v. Board of Education,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Viewing the case as a clash between "two divergent lines of [statutory] authority," 454 U.S. at 105, 102 S.Ct. at 180, the Supreme Court ruled that the principle of comity together with section 1341 require abstention in the face of jurisdiction under section 1983.

Section 11503 involves no such collision with the Tax Injunction Act. Its legislative history, unlike that of section 1983, evinces a congressional intent to exempt taxpayer plaintiffs from the Tax Injunction Act as well as from the comity principle. Further, because the economic due process claims in *Fair Assessment* fell at the extreme periphery of the concern behind section 1983, abstention in that context left the vital core

---

**13.** In this case the district court enjoined the state board's issuance of an order assessing taxes. Thus Georgia has been unable to assess and collect even the undisputed portion of the taxes. Under Georgia law interest on past due taxes does not begin to accrue until after such an order is issued. If the district court does not grant appropriate equitable relief the railroads stand to gain a substantial and undeserved profit from their resort to federal court.

of section 1983 protections intact. Abstention here, in contrast, would rob the jurisdictional grant of section 11503 of all meaning, since the railroad plaintiffs belong to the small class of direct beneficiaries contemplated by Congress and seek precisely the tax relief the section affords. Finally, the potential for wholesale federal litigation of state taxpayer claims, very real under section 1983, is nonexistent under section 11503.

*Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), exemplifies an instance in which a jurisdictional statute properly took precedence over the equitable restraint doctrine and its statutory counterpart, section 1341. The Supreme Court gave effect to a district court decision enjoining Montana's collection of certain vendor licensing and sales taxes from Indian merchants. In deciding that abstention in the case was improper the Court relied on a jurisdictional statute, enacted ten years earlier, which reflected a congressional intent to provide Indian nations with a federal forum for certain civil actions. *See* 28 U.S.C. § 1362. Neither the statute nor its legislative history mentions any exemption from the Tax Injunction Act. The Court concluded however that the statute conferred jurisdiction despite the command of the Tax Injunction Act because the statute, as construed, extended to the tribes the common law exception to section 1341 which allows the United States and its instrumentalities to sue in federal court to complain of "unconstitutional state exactions." 425 U.S. at 470–74, 96 S.Ct. at 1639–42 (quoting *Department of Employment v. United States,* 385 U.S. 355, 358, 87 S.Ct. 464, 467, 17 L.Ed.2d 414 (1966)).

The railroads in this case as the Indian groups in *Moe* are beneficiaries of recently enacted nonexclusive grants of jurisdiction. Both groups reside near the center of the concern underlying the federal policy reflected in the laws enacted. The particular case which the railroad carriers press here bears more directly on the narrow situation contemplated by Congress than does the cause in *Moe* on the much broader grant of section 1362. *See Moe,* 425 U.S. at 473, 96 S.Ct. at 1641. The express words of exemption contained in the legislative history of section 11503 are a further recommendation not present in *Moe* against abstention.[14] We conclude that the recent, specific expression of congressional intent and national policy reflected in section 11503 requires federal district courts to hear section 11503 cases brought before them. We find that the district court in abstaining abused its discretion, reverse and remand to district court for consideration on the merits.[15]

## VI. The Cross-Appeal.

The state board argues on cross-appeal that the injunction entered by the district court has prevented it from obtaining the undisputed portion of the railroads' tax bill. The state board also argues that the

---

14. It is the state board's contention that the role of an independent judiciary is to apply its own notions of comity and federalism in disregard of those expressed by Congress in legislation. As our opinion in this case indicates federal courts have never applied the abstention doctrines in a vacuum. These doctrines are shaped by competing state and federal interests and both interests must be considered. The supremacy clause requires the courts to grant great deference to Congress' direct, unequivocal and constitutional exercise of its legislative power. This case presents no compelling reason for the court to ignore Congress' intention and refuse to exercise its duly conferred jurisdiction.

15. When the district court decided this case there was only one other court which had directly addressed the abstention issue. The other court abstained. *Missouri Pac. R.R. v. Tax Div.,* 504 F.Supp. 907 (E.D.Ark.1980). Since that time there have been several more. To our knowledge none other than the district court in this case has chosen to abstain. *See Burlington N.R.R. v. Bair,* Civ. No. 83–100–A (S.D.Iowa filed June 17, 1983); *Atchison, T. & S.F. Ry. v. Arizona,* 559 F.Supp. 1237, 1248–49 (D.Ariz.1983); *Trailer Train Co. v. State Bd. of Tax Comm'rs,* No. IP 82–45–C (S.D.Ind. Nov. 3, 1982); *Southern Pac. Transp. Co. v. California,* No. C 81–4848 SW (N.D.Cal. Sept. 1, 1982); *Atchison, T. & S.F. Ry. v. Lennen,* 552 F.Supp. 1031, 1037–38 (D.Kan.1982) (disapproving the result reached by the district court in this case).

railroads will be unjustly enriched should the state not receive interest on the undisputed amount. We agree and order the district court to modify its injunction to allow the state to immediately assess and collect the undisputed amount of taxes without waiving its entitlement to the disputed amount. Furthermore the district court should require the railroads to pay interest on the undisputed amount of taxes and on any additional amount the court finds not in violation of section 11503 and the state chooses to assess and collect. The interest is to be assessed from the date such taxes would have become due *but for the district court's injunction* and at the rate set by Georgia law for taxes due but not paid from that date until payment is actually made.

REVERSED and REMANDED WITH INSTRUCTIONS.